May it please the Court, my name is Nick Cady. I'd like to reserve two minutes for rebuttal. I'm representing Appellants Cascadia Wildlands and Oregon Wild, and I'm joined by Mr. John Purcell, Staff Attorney with Oregon Wild. So this case concerns the BLM's Big Weekly Elk Project, which authorizes commercial logging in Oregon's Coast Range southeast of Coos Bay, and there's four main issues I want to touch on here today. The first is I want to talk about murelets and this project area and why we're here, because appellant organizations generally support plantation thinning, which is the majority of this project, but this area is unique. Second, I want to talk about the Resource Management Plan, the RMP, its murelet protections, and BLM's efforts to avoid them here. Third, I want to touch on how these protections are in harmony and consistent with the remainder of the Resource Management Plan and talk about BLM's options for moving forward here in this project area. And fourth, I want to discuss NEPA and how BLM's analysis contains serious errors and omissions in light of Eagle County. You'll cover it in the order that you want, but I want to know at an early point, as you know, the Trump administration recently issued an interim final rule removing the NEPA implementing CEQ regulations from the Code of Federal Regulations. I want to know what impact, if any, that has on this case. I think I can address that now. I think that has no impact on the NEPA claims now. I think it's BLM articulated in the environmental assessment in finding of no significant impact the regulations that it was relying upon in that case. And I think now, moving forward, they can rely on their own regulations or I think it's a little unclear, but I think in this case, we're looking at what the BLM relied on here in these documents. I also want to ask you, it seems to me that you've taken a markedly different position between your opening brief and your reply brief. In the opening brief and before the district court, you seem to admit that there's no direct alteration of nesting habitat, but say that the edge effects from non-habitat can result in modifications of murrelet nesting habitat. But in the reply brief, you broaden the definition of nesting habitat to include younger strands. Isn't that a radically different position? I would argue that it's not a different position. I think the terms nesting habitat and nesting structure, if you look throughout the record, are used fairly interchangeably and in different contexts used different ways. Nesting structure is going to be an individual tree that murrelets can nest in, right? Nesting habitat is the forest area around. Before the district court, it seemed to be a fairly narrow definition. You seem not to have broadened it. Isn't that correct? I think it is correct and I think we put a footnote in the reply brief trying to explain kind of the difference there. I think the claims have always been the same. The BLM is not following these murrelet management directions, they're not surveying, they're not designating occupied stands per RMP direction, and they're not buffering. But I think murrelet habitat has a number of different definitions. And so if you look at, for example, in the resource management plan's biological assessment at ER 11651166, murrelet nesting habitat can be a patch of nesting structure. And I think that's how we referred to it in the opening brief. When getting plaintiff's response brief, in this case, I realized how they were kind of using it as a term of art and kind of adjusted to kind of reflect the intention and meaning of the resource management plan. So your answer is yes, it is expansion. I don't think it's an expansion. I think we were using it in kind of a general colloquial way. I think BLM was using it in a very specific way. I think our reply brief, maybe it took me longer than it should have, but picked up on that usage and then responded to it and addressed it. So murrelets are seabirds that nest in coastal old growth. They lay their eggs on thick lateral branches high up in the canopy. This type of nesting structure takes 200 to 250 years to develop. In addition to nesting structure, murrelets need large blocks of unfragmented forest around that nesting structure to breed. BLM assumed it would take a couple hundred acres of forest area around nesting structure to support a single pair of nesting murrelets. So nesting habitat is not just the old growth nesting trees, it's the forest surrounding it. Murrelets need this forest as insulation, as protection from elements, but mainly to hide from predators. The first nest wasn't discovered until 1974, so the bird does a pretty good job at hiding. And if you log the forest surrounding nesting structure, this leads to adverse edge effects. This includes increased exposure and weather, but again, predation is the main thing in Oregon, which is driving population dynamics. BLM lands in Oregon, which have been flagged as highly problematically fragmented, they have very high nest predation rates. It can reach up to 60 to 80 percent. So edge effects general to rule of thumb is they reach 300 to 600 feet and into an adjoining forest area, nearly all of the proposed logging here is within 300 feet of an extensive network of nesting structure. This area has a uniquely large amount of never-before-logged old growth. And this is why the stands in the Big Weekly Elk area, quote, are mapped as suitable nesting habitat. That's ER 197. This is why over 50 murrelet sites have been documented here. That is an unusually high number. And the project area contains nearly a quarter of all murrelets on BLM lands, which is 2.6 million acres. This is why appellants are here with this case. This is a uniquely important area. And so the Resource Management Plan has murrelet protections. They apply in every land use allocation in Zone 1. So they apply to the entire project area here. And both parties agree that these protections are triggered by modifying nesting habitat or removing nesting structure. It's interesting to me. Do you agree that the BLM is not logging in occupied sites? Yes, but I think that's because they're inappropriately avoiding finding occupied sites. You'd want to treat occupied sites as within 300 feet, but that's a new construction, is it not? No, I think the BLM is avoiding the survey requirement, which would then compel if they got a survey result, would compel the designation of an occupied stand, which is that quarter mile plus a 300 foot buffer, right, under the Resource Management Plan. Can you cite any case law that would, if you will, buttress your position? It seems to me, I've done a lot of environmental law cases, and it seems to me you are taking some pretty clear law of what they can and cannot do, and you're, if you will, putting an X factor into it. You're just saying, you know, it's a practical matter. You get too close to these things, you're going to create harm. But it's new. It's a new spin. And what I'm looking for is where, what's your justification for that? I would argue that we're not introducing anything. I think all that we're asking, all data appellants are asking BLM to do is apply that five acre standard, draw the analysis area, apply the five acre standard to determine whether or not nesting habitat is present. But it's new. It's new, right? I mean, I understand you think as a matter of logic it should go there, but do you not agree that there is no current case law that buttresses your position? Oh, absolutely. There's no, this Resource Management Plan was new in 2016, so we are in the process with the BLM now of kind of, there's a number of provisions in this Resource Management Plan that are before. So, yes or no, there are case law that back you up? Back me up? There's no case law specifically about this standard. So, you're asking us to make new law? Correct. I'm asking for a novel interpretation of the BLM's marble murelite protections in the Resource Management Plan. And I think this course correction is warranted because BLM's projects are all over the map with this murelite standard, and so I think this is necessary. And so, the question before this court is what does modifying nesting habitat mean? I think that is the legal question that you're resolving. And R&P interpretive issues start with the text. The relevant provisions here are three bullet points just before the murelite protective options. And the disagreement between the parties hinges on this first sentence. It says, before modifying nesting habitat or removing nesting structure, assess the analysis area for nesting structure. And so, BLM's argument is that it does not need to assess an analysis area until it's proposing to modify nesting habitat. But this is just not a serious interpretation because if you keep reading the R&P text, it explicitly says that the analysis area is how BLM identifies relevant nesting structure so that you know if you're modifying it or removing it. It says, quote, the analysis area includes all nesting structure that could be affected by habitat modification. Let me ask you this. I realize that this case, the Supreme Court's recent case, deals with NEPA. I wrote a case years ago called Lands Council v. McNair. And basically what we said is you've got different opinions. You folks are brilliant. You go in and you make all these arguments. There are thousands of pages of objections. But ultimately, the agency has to balance it. And what we concluded in Lands Council and the Supreme Court seems to have concluded in its recent NEPA cases, you've got to defer to these people unless you've got some direct evidence that they're just flat out wrong and they're not complying with the law. And that's frankly what I'm struggling with in your case here. You're smart people. You're dedicated people. But you've got the BLM, which has got all this record, all these people making comments, and they have to balance it somehow. Their argument is that they did. What's your best argument that they didn't? I think there's a few points here. So I think the balancing already occurred when the agency developed the resource management plan, came up with the land use allocations, and developed the wildlife protections. And they modeled out how all of this would apply. I think one of the best facts for why what the BLM is doing here is kind of inconsistent with that balancing that occurred, is the BLM predicted that extensive surveying would occur prior to logging in LSR in the late successional reserves in Zone 1. Here we have a project area that's undoubtedly like mirelet zone, and we have no surveys in the LSR whatsoever. And so I think there's this inherent inconsistency. The BLM also predicted and modeled that there would be 380 some odd occupied stands designated. Here we have a single stand designated in the harvest land base. And so I think with that balancing and with the math that went into the BLM's modeling, they predicted that there was going to be extensive occupied stand designation. They modeled that there would be no logging at all in the occupied stands. These were to occur in the LSR and the harvest land base. And so I think what we have here is this super important area for marble mirelets, and we have none of that applying. And I think that's a major red flag that something's wrong. I think the other major red flag that something is wrong is BLM's position, Fish and Wildlife Service disagrees with it. It's in open conflict with the biological opinion. That is something we've never run into in the timber sale context before. Like that is a major red flag that this is an inconsistent interpretation. When you say a major red flag, you're saying that if the BLM models something and they say we think this is going to happen, and you're saying no, that's not what's going to happen, then you go down the road several years and you say, you know what, they were wrong. Is that essentially what you're saying here? Could you repeat that question? I'm sorry. What I'm saying is the BLM did certain modeling. They predicted certain things. And you said no, something else is going to happen. Go down the road, something maybe in between happened. And you say, you know, the BLM, you got it wrong. You modeled it wrong. Is that what we look to? Or do we look at what the facts were as people examined them at the time the report was done? I think, so the modeling very explicitly in the RMP doesn't control anything, but I think it's a strong indicator of how the RMP was anticipated to play out on the ground. Again, that gets back to my basic point. Again, you guys are really smart people. You really want to get a result. But ultimately the BLM has to take everything that it gets in, tons of stuff, and they do their best. They do their best. And it's not just one administration or another. This is carried over for several administrations. And yet they still come up with the answer that you don't like. And ultimately, we as a court have to determine, okay, how do we determine this? We're not scientists. I said that in lands council. We're not scientists. We have to depend on the scientists. And when they say something, you know, one person says X and the other person says Y, we defer to the agency unless you can show that they knew it was just flat out wrong and they're not complying with the law. I'm not seeing that here. What am I missing? So I think one of the other kind of factual circumstances that clearly indicates the BLM is doing something wrong is that there is anticipated take of four marbled murrelets from the proposed logging. That's from the harvest land-based logging. The Fish and Wildlife Service didn't even estimate take from the LSR because they said it would require more on the ground information, which they did not have. But the fact that that take is occurring means that the RMP is being applied wrong. The RMP anticipated that the only take that would occur would be in zone two in the harvest land-based. No take would occur in zone one because they were going to be liberally serving for designating protected occupied stands and then buffering those stands. And that is what the agency is inappropriately avoiding here. And I'll just say, I think with the modifying nesting habitat, all of these questions, and I know you're talking about deference, under Kaiser, I think we have, this is a question of like RMP interpretation, of like what this language means. And I think we need to like start and I think we can end with the text. Forgive me, I can't hear you very well. I'm sorry. I think we want to start and end with the text of the resource management plan. And the resource management plan clearly lays out a step-by-step process for determining whether you're modifying nesting habitat. And this is you delineate an analysis area. That analysis area may contain no nesting structure. BLM can do whatever it wants. Or if it does contain six or more nesting trees within this five-acre moving circle, BLM has to employ one of the Murelet protective options. And I think here, BLM is like, hey, we need to log these plantations. There is still a way for BLM to log the plantations here. So the survey and designate occupied stand, that's one of three, four different protective options under the resource management plan for Murelets. Option two here allows the BLM to move forward. They don't have to survey. They don't have to designate occupied stands. They just have to implement a lighter logging prescription, which is still commercial, still commercial volume. They just don't have to do, they're just not going to be able to log this heaviest logging prescription. I know you're almost out of time. I know you want to save a couple of minutes. But I want to get to the NEPA concept. You seem to rely primarily on the failure to take a hard look. And I don't find that very convincing. And I look at the Supreme Court's recent seven-county infrastructure coalition versus Eagle County, and it seems to further undercut your argument. How would you respond to that? So in Eagle County, the Supreme Court reiterated that an agency's NEPA analysis gets deference on the issues of the detail, the level of detail required, the scope of the issues considered. And if you don't project into the future, you're dealing with the current facts, right? Right. So under that standard, why did they get NEPA wrong? So I think there's no question here that Murelet effects are relevant. And appellants aren't arguing or asking the BLM to amass more detail or jump through more hoops. Appellants' argument is that BLM had this, it had to take determination from Fish and Wildlife Service, did not disclose it, it had all of these units laid out, didn't disclose it in any of the NEPA documents. As I read it, what you're basically saying is they looked, but they didn't look hard enough because you found some things that they didn't find and you disagree with them. That basically right? I think they looked, they didn't like what they saw because their new RMP interpretation from Murelet's was inconsistent with how the RMP and the Fish and Wildlife Service were saying this should be applied. And so they obscured the negative effects that would reveal that this project was inconsistent with the Resource Management Plan. That's why they didn't disclose take, that's why they didn't lay out any of these logging units on the ground. They were trying to amass the fact that this project was way out on a limb. You want to say the rest of your time? It's up to you. I believe I will. Thank you. Okay. Thank you. All right. Mr. Glenn, please. Good morning. May it please the Court. Kyle Glenn here on behalf of the Bureau of Land Management. Your Honors, I'll start with the Flippman claim before turning to the NEPA claim. And on the Flippman claim, I think it's best to begin just by describing the balance that the 2016 RMP struck. Through the 2016 plan, the Bureau set aside a large amount of forests and reserves that would actively manage to promote recovery of threatened and endangered species like the Murelet, a system where the Bureau would preserve existing Murelet habitat while also actively working to restore it in areas that it doesn't exist, where it's been lost. The Bureau also set aside a much smaller area, the harvest land base, that it would manage to ensure a predictable supply of timber harvest every year. Now, the Big Weekly Elk Project simply implements this balance. Most of the project which occurs within reserves is not a habitat modification project. It's not a habitat removal project. It's a habitat restoration project. The Bureau is thinning in stands that are in forest areas that lack suitable existing nesting habitat. And it determined that the best way to get these forests on track to developing those traits within the foreseeable future is to conduct these sorts of thinning treatments now. And I'd like to address a point about what the environmental assessment says in the record excerpts at page 197. That part of the EA does say that the Bureau is conducting some thinning treatments in stands that are mapped as including suitable habitat. However, it also says that the Bureau will only thin the parts of the stand that don't meet habitat criteria. So there's no late secession reserve thinning treatment here that targets existing suitable habitat. The whole point of these treatments is restoration. And with that, I'd like to turn to how the Bureau is implementing option one of the MERLET direction for this project. I don't think there's any real dispute here that the MERLET direction only comes into play if the Bureau first proposes to modify nesting habitat or remove nesting structure. And none of that was proposed, right? Sorry, Your Honor? No such thing was proposed, right? Not within the late secessional reserves. It is within the harvest land base, but that's why the Bureau is surveying in the harvest land base. Now option one requires surveys and if the surveys reveal evidence of MERLET occupancy, setting aside the surrounding quarter mile of forest and buffering it by 300 feet. As I noted, the only part of this project or the only timber activities in this project that occur within existing nesting habitat are within the harvest land base. And that's why the Bureau is surveying and setting aside any new occupied site. Within the late secessional reserve, for these treatments, the Bureau is not required to implement option one. And I'd like to address a point that plaintiff's counsel made about what the plan envisioned in terms of surveying in the late secessional reserve. And I'd actually like to make two points about that. One is that plaintiffs cited a part of the biological opinion for the project that what they say says, what they say shows that the Bureau envisioned extensive surveys in reserves. But that part of the biological opinion, specifically, I believe it's in the record excerpts at 1227, was about the harvest land base. That was not about surveys in reserves. And two, most of the reserves here that the Bureau is not surveying are within sites that the Bureau already surveyed or has already been surveyed under the Northwest Forest Plan and designated as occupied. The marble murrelet directions within the RMP don't apply to those sites. The Bureau made clear in its plan and the supporting documents that the murrelet directions are a process for protecting new occupied habitat that had not yet been discovered. And once you take out that large chunk of habitat that the Bureau is not surveying within the late secessional reserves, there's not much left to plaintiff's claim that this issue of what modifying nesting habitat bears on. The question would be, well, what adjacent but suitable nesting habitat is the Bureau supposed to survey and is not surveying? And as we explained in our brief, the Bureau's interpretation of modifying nesting habitat as being direct alteration of nesting habitat is built into the plan itself. As the District Court explained, the Bureau modeled the allowable sale quantity, the amount of timber that it could make available for harvest every year under the ONC Act based off this interpretation of modifying nesting habitat. And just to put a finer point on it, the way the Bureau did that was by, well, I'll take a step back. The Bureau in its plan stressed the need for certainty and predictability in meeting the declared ASQ. So to ensure that predictability, it stressed that it assumed full implementation of the planning directions, including the Marble Murrellet direction and its survey and buffer process. And the Bureau made a downward deduction to its ASQ based off of harvest within habitat by predicting how much of that would have to be set aside through surveys that reveal occupancy. The Bureau did not make any downward adjustment to its ASQ declaration based off of harvest next to habitat that it knew was occupied. It knew where this habitat was within the Northwest Forest Plan area sites. It knew that habitat was occupied. And its modeling assumed that harvest would occur up to the edge of that habitat. So what the Bureau essentially did was tell its model that harvest up to the edge of that habitat won't modify it, so don't make a downward adjustment in the ASQ based off of that. And I'd like to stress about the Fish and Wildlife Service, the only open disagreement here between the Fish and Wildlife Service and, it's between the Fish and Wildlife Service and the plaintiffs rather than between the Fish and Wildlife Service and the Bureau. The Fish and Wildlife Service, once it became aware of the difference in interpretation about what is modifying nesting habitat, it prepared a new effects analysis pursuant to the Endangered Species Act. It acknowledged that the Bureau's ASQ modeling was based off of the interpretation of modifying nesting habitat to mean direct alteration of it. And on top of that, the Fish and Wildlife Service prepared a biological opinion for this project, concluding that this project is consistent with the management direction of the Bureau's plan. Based on the definition of modifying nesting habitat, correct? I mean, the odd thing about this case is you have the two agencies that seem to disagree what that phrase means. And I understand that you proceeded with a series of assumptions to try to get to your opinion. But at the end of the day, to me, this case seems to turn on whether or not your construction of modifying nesting habitat is due deference, right? Well, Your Honor, we believe that we have the best reading of the plan. Right. I know you do. But the Supreme Court has instructed how we do the analysis. And my concern in this case is that the district court didn't do the complete Kaiser analysis. And when it got down to the four factors, it did the first two and didn't do the remaining. So my question to you is, what do we make of that? Leaving aside, I understand your argument about reasonability and what happened here. But as I look at it, the Supreme Court says, here's your task, here's how you analyze it, and it appears that the district court analysis is incomplete. So what do I do with that? Well, Your Honor, to the extent that the district court's analysis is incomplete in terms of going through the steps of Kaiser, we don't believe that would . . . this Court can still affirm because the standard of review here is de novo. And the Court doesn't owe any deference to the district court's analysis or application of Kaiser. Right. But then, so how are we to independently go to the third and fourth steps of Kaiser, that part of Kaiser? I mean, that's usually what we ask the district courts to do to weigh that. I mean, I'm going to ask them whether this is subject to harmless error, but I mean, that's my concern procedurally, is that the district court didn't, in my view, didn't finish its job. Well, Your Honor, the first step of any textual interpretation is beginning then with the text and the surrounding context, and we believe that this analysis ends there. So we believe that the Court could affirm simply on that basis without reaching the other steps of Kaiser. There's no genuine ambiguity here in the Marble Murrellette direction because the . . . Well, the problem I have with that genuine ambiguity is you have a disagreement about what the phrase means among two agencies. And to me, it's not obvious on its face of what modifying the habitat means. Well, Your Honor, although the Fish and Wildlife Service initially understood the phrase as used in the plan to mean something other than what the Bureau intended, it acknowledged that the Bureau's interpretation was always the intended interpretation. It was built into the plan. Well, did it, or did it just say, we'll proceed under your assumption? I mean, I didn't, I may have missed it, but I didn't see anything in Fish and Wildlife saying that said, yeah, you were right, we were wrong. Well, Your Honor, the Fish and Wildlife Service did continue to recommend as a policy matter that the Bureau apply these 300-foot buffers around the Northwest Forest Plan occupied sites. But it did acknowledge in its new effects analysis, specifically in the record excerpts at 894, that the Bureau had intended modifying nesting habitat to mean direct alteration of nesting habitat. Right. I mean, it acknowledged what the Bureau did, but it didn't say, yeah, you were right and we were wrong. It just said, this is what you're doing, and so we'll do the analysis. That's why I read it. Well, I believe it ultimately made that determination in its biological opinion for this project when it concluded that the project here is consistent with the management direction of the plan. It had acknowledged that there is initially that misunderstanding in its biological opinion, but also acknowledged that the Bureau had clarified its meaning of that. Did it say misunderstanding? It just said, well, we'll take your version of it and we'll run the analysis. The biological opinion did not say misunderstanding, but it had acknowledged that there was originally that question that arose. What do we do with that? As my colleague points out, the District Court didn't do the full Geyser analysis. You have a disagreement between Fish and Wildlife and the BLM, which ultimately just acquiesced. How do we treat that? Your Honor, I don't think it bears on the Court's analysis here, really, simply because the Bureau was charged under FLTMA with, you know, drafting these land use plans and implementing them. And the Bureau's interpretation here, because it's the best interpretation, is, well, this Court owes no deference to the Fish and Wildlife Service's interpretation on that. No, no, no. What I'm, my, I didn't mean to interrupt, but you start with the, is this ambiguous? And you have two agencies that have a different interpretation, which tells me, yeah, it's probably ambiguous. And then the question is, does the Bureau's interpretation do deference? And the Supreme Court in Geyser said, here's how you determine that. And, again, my concern is the District Court didn't finish the analysis. My educated guess is, if it had, it would have come out your way as well. But analytically and on review, that's my concern. And I'm just expressing that so that you can respond and tell me why it doesn't matter. Well, Your Honor, as you noted, if the analysis would be the same, that's a question that this Court could itself resolve without acknowledging those, the District Court not reaching those steps. And I would also point out that Or we could do a limited remand and say, finish, finish. Well, I guess that's where the question of harmless error would come into play, Your Honor. But we Is harmless error appropriate here? I mean, usually that's a concept in criminal cases and some civil cases. But agency cases, I'm not sure. Well, we believe that the Court would not even need to reach that question simply because the best reading of the plan here is that modifying nesting habitat means direct alteration of nesting habitat. And I would just, I would again emphasize that once you take out the Northwest Forest Plan-era occupied sites, there's not much left over that the Bureau is at issue. The Bureau surveyed both the habitat that is within the harvest units and adjacent to the harvest units within the harvest land base. So the only question would be what's left in late-successional reserves. And the Bureau is avoiding even indirect modification of, I think it's 56 acres of unsurveyed but suitable nesting habitat in late-successional of the Fish and Wildlife Service. So I think no matter the approach here, the Court still has a basis to affirm. Yeah, except that we really can't jump to saying, oh, yeah, you're reasonable without going through the steps of Kaiser. I mean, we may think looking at your approach and listening to you today that your approach is reasonable and your interpretation is reasonable, but that doesn't cut out the analysis that's required. That's my, again, that's my concern. Can we do that as a Court of Appeal? Can we construe and determine how the missing analyses of the Kaiser principles are to be decided? Or do we have to send it back to district court? Well, I'd like to take a step back because I don't think that the ultimate question here is whether the agency's interpretation is reasonable. It's simply whether it's the best reading. And that's why we Okay, substitute best reading for my question. We don't think that this Court would have to do a limited remand to the district court on that purpose. This Court could reach those steps itself because, again, the standard of review here is de novo, and the Court owes no definite What would we look at to fill in the blanks of the missing Kaiser elements? From this record, Your Honor? Yes. Well, there's the, just in terms of reasonableness, the fact that the Fish and Wildlife Service is not charged with, the Fish and Wildlife Service did not draft this plan. It's the Bureau's plan. And the ASQ modeling, there's no, we're talking about a very comprehensive planning process that led to the RMP here. It was a four-year planning process, an extensive four-volume environmental impact statement, and the only contemporaneous contextual evidence that, or the contemporaneous contextual evidence here shows that the only intended meaning of modifying nesting habitat was direct alteration of nesting habitat. That's how the Bureau modeled the ASQ and assessed effects from the plan under NEPA. And plaintiffs really have not pointed to any countervailing contextual evidence besides the Fish and Wildlife Service's biological opinion that it itself departed from in concluding that this project is consistent with the plan. And I'd like to, if the Court has no further questions on the FLIPMA point, I'd like to briefly turn to the NEPA claim here. We believe, as we noted in our supplemental authority letter, that Seven County really was a sharp course correction in terms of ensuring agency compliance with NEPA. And plaintiffs' claims here really do go to the scope of the environmental assessment and the level of detail that was provided for in that environmental assessment. And the Supreme Court stressed that those matters are the sort of policy-laden, fact-specific judgment calls that are within the agency's discretion and warrant substantial deference. And just to follow up on your question about the NEPA regulations, we don't believe that the rescission has any impact on this case. Like in Seven County, this Court could resolve the NEPA claim simply on the basis of looking to the statute itself. The statute itself only requires the agency to prepare a detailed statement if it determines there are significant environmental impacts. And the ultimate standard to review for that is the APA's arbitrary and capricious standard. Plaintiffs haven't shown that affording the agency the substantial deference that the Supreme Court explained was necessary in Seven County, that the agency's NEPA analysis here was arbitrary or capricious in any way. If the Court has no further questions. The question? I think not. All right. Thank you, counsel. Thank you. All right. Mr. Cady, you have a few minutes of rebuttal. So I'd love to pick up on where that discussion left off about Kaiser. And I think that the question we're answering is reasonableness of that interpretation. And Kaiser explained that the same factors that you would consider, like the context, purpose, intent, all of those factors weigh on both the question of reasonableness and ambiguity. And so even if this Court were to find based on those two agencies' conflicting interpretations of this provision that the language modifying nesting habitat is ambiguous, I think there are a number of reasons why that interpretation is unreasonable. So I gather you would encourage the Court to have a limited remand for the District Court to further analyze the Kaiser elements. Is that right? I think that's one route open to the Court. I also think this Court could address the reasonableness of the OLM's interpretation itself. So you think we could address it ourselves? I believe so. This is an administrative record case. Well, right. But I mean, you start off, is it ambiguous? Assuming it is. Then is their interpretation reasonable? Let's assume that it is. Then you get down to whether the agency's interpretation is entitled to controlling weight. And that's where the District Court – and I think I said four factors, but there are only three – didn't deal with the third factor. So my question is, to your point, what should we make of that? Is it required? Can we do it? That's an interesting question. I am not sure I have the answer to Kaiser's relatively new case law. I will say – I mean, both of you seem to want us to cut to the chase on reasonableness. I think this is unreasonable for a few reasons. First, the RMP contains its own test for determining whether or not you're modifying nesting habitat. This is the analysis area, the five-acre moving circle. It explicitly says it's to address and account for edge effects. BLM's interpretation just looks within the logging unit itself. It can't address that. And basically, BLM is making up its own test for modifying nesting habitat to replace that one that exists in the RMP language. The consequences of BLM's test is there will be no mirelet surveys in LSR. That's how we see it play out on the ground. That is a major fundamental change of the plan. To address the miscite, I did catch this and meant to touch it. It's ER1230. Fifty percent of LSR logging was supposed to be surveyed. Here we have LSR logging in one of the highest mirelet concentration areas on BLM lands. No surveys. Okay. Any questions about my colleague? Thanks to counsel for your exhaustive argument. I hope you're not too exhausted. Thanks to everybody in this case. The case of Cascadia Wildlands v. United States Bureau of Land Management is submitted, and the Court stands adjourned for the day.
judges: THOMAS, SMITH, Rayes